UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

THE TRAVELERS INDEMNITY COMPANY and
THE PHOENIX INSURANCE COMPANY,

      Plaintiffs,

v.

FIGG BRIDGE ENGINEERS, INC.; *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Plaintiffs, The Travelers Indemnity Company ("Travelers") and The Phoenix Insurance Company's ("Phoenix['s]") Renewed Motion for Summary Judgment [ECF No. 144] ("Pls.' Mot."); and Defendant, Figg Bridge Engineers, Inc.'s ("FIGG['s]") Response in Opposition to Renewed Motion for Summary Judgment and Defendant's Cross Motion for Summary Judgment as to the Duty to Defend [ECF No. 149] ("Def.'s Mot."). Plaintiffs filed a Joint Response to [Def.'s Mot.] and Reply in Support of [Pls.' Mot.] [ECF No. 159] ("Pls.' Reply"); to which Defendant filed a Reply in Support of [Def.'s Mot.] [ECF No. 175] ("Def.'s Reply").[1] The Court has carefully reviewed the Second Amended Complaint [ECF No. 70] ("SAC"), the parties' submissions, the record, and applicable law.

---

[1] The parties' factual submissions include: Plaintiffs' Statement of Undisputed Material Facts [ECF No. 145] ("Pls.' SOF"); Defendant's Opposition to Plaintiffs' Statement of Facts [ECF No. 150] ("Def.'s Opp. to Pls.' SOF"); Defendant's Statement of Uncontested Material Facts [ECF No. 151] ("Def.'s SOF"); and Plaintiffs' Response to Defendant's Statement of Material Facts [ECF No. 160] ("Pls.' Resp. to Def.'s SOF").

# I.    BACKGROUND

## A.    Introduction

This is an insurance coverage dispute concerning Plaintiffs' duty to defend numerous personal injury lawsuits stemming from a fatal 2018 bridge collapse in Miami, Florida.

In 2015, FIGG and Munilla Construction Management, LLC ("MCM") entered into a contract with Florida International University ("FIU") to design and construct a bridge to accommodate pedestrian traffic between the FIU campus and the city of Sweetwater. (*See* SAC ¶¶ 36–37). Plaintiffs provided general commercial liability insurance policies to FIGG; those policies included professional liability exclusions. (*See* Pls.' SOF ¶¶ 1–5).

On March 15, 2018, the FIU pedestrian bridge collapsed, killing and injuring several people. (*See* Pls.' Mot. 2). As a result of the bridge collapse, various individuals filed personal injury lawsuits against FIGG. (*See* Def.'s SOF ¶ 1). The lawsuits were consolidated into a single case in state court, in which the presiding judge required the plaintiffs to file two separate complaints (the "Underlying Complaints"). (*See id.* ¶¶ 2–3). The Underlying Complaints have since been amended, and on October 10, 2018, the state court plaintiffs filed a Third Amended Model Worker Complaint [ECF No. 70-2] ("MWC") and Third Amended Model Complaint for Civilian Cases [ECF No. 70-3] ("MCC"). (*See* Def.'s SOF ¶ 4). As the state court case progressed, Plaintiffs sent multiple letters to FIGG (*see* Exhibit A [ECF No. 146-1] 6–83), agreeing to defend FIGG against the Underlying Complaints, subject to a full and complete reservation of rights.[2] (*See* Pls.' SOF ¶¶ 16, 17).

Plaintiffs filed this action in June 2018. (*See generally* Complaint [ECF No. 1]). A few months later, Plaintiffs filed the operative SAC. Plaintiffs seek a declaratory judgment that they

---

[2] FIGG disputes whether Plaintiffs' letters include a proper reservation of rights under Florida law. (*See* Def.'s Mot. 16–20).

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

did not owe FIGG a duty to defend the allegations in the Underlying Complaints.  (*See id.* ¶¶ 94–99).  Plaintiffs also seek reimbursement for the fees, costs, and other expenses they incurred defending FIGG against the Underlying Complaints.  (*See id.* 20).

On March 5, 2019, FIGG filed a Joint Motion to Dismiss as Moot [ECF No. 138].  FIGG argued there was no longer a case or controversy before the Court, as the Underlying Complaints had been dismissed in the state court action.  (*See id.* 4).

The Court granted FIGG's Joint Motion to Dismiss in part.  (*See* March 19, 2019 Order [ECF No. 143] 3).  The Court agreed dismissal of the Underlying Complaints resulted in there not being a case or controversy.[3]  (*See id.*).  Yet, the Court found Plaintiffs could continue to seek reimbursement of fees and costs advanced to FIGG in defense of the Underlying Complaints attached to the SAC.  (*See id.*).  The parties now move for summary judgment, asking the Court to determine whether Plaintiffs owed FIGG a duty to defend the allegations in the Underlying Complaints, and if not, whether Plaintiffs are entitled to reimbursement for the defense-related payments made on FIGG's behalf.  (*See generally* Pls.' Mot.; Def.'s Mot.).

### B. The Policy Exclusions

On November 1, 2017, Phoenix issued an insurance policy to FIGG providing commercial general liability coverage through November 1, 2018.  (*See* Pls.' SOF ¶ 1).  Concurrently, Travelers issued FIGG an umbrella policy for the same one-year period.  (*See id.* ¶ 4).

Both polices include identical professional liability exclusions for "'[b]odily injury' or

---

[3] Given the evolving nature of the state court case and its pleadings, and as a result Plaintiffs' stated intention of amending the pleadings in this case every time the state-court plaintiffs amended their complaints, the Court entered an Administrative Order Closing Case [ECF No. 47] on August 22, 2018.  Because Plaintiffs insisted the Court reopen the case despite the evolving nature of the state court pleadings, including the appearance of new parties, in granting Plaintiffs' request to reopen, the Court advised Plaintiffs could "not seek leave to amend the Complaints in this case after new state court pleadings are filed."  (March 19, 2019 Order 3).

'property damage' arising out of the rendering of or failure to render any 'professional services.'" (Commercial Insurance Policy [ECF No. 70-5] 371 (the "Exclusion") (alteration added)).[4]   The Exclusion defines "professional services" as "any service requiring specialized skill or training," including:

> a.   Preparation, approval, provision of or failure to prepare, approve, or provide any map, shop drawing, opinion, report, survey, field order, change order, design, drawing, specification, recommendation, warning, permit application, payment request, manual or instruction;
>
> b.   Supervision, inspection, quality control, architectural, engineering or surveying activity or service, job site safety, construction contracting, construction administration, construction management, computer consulting or design, software development or programming service; or selection of a contractor or subcontractor; or
>
> c.   Monitoring; testing, or sampling service necessary to perform any of the services described in Paragraph a. or b. above.

(*Id.* ¶¶ 3(a)–(c)).   Plaintiffs' duty to defend FIGG turns on whether the allegations in the Underlying Complaints fall under the Exclusion.

## II.   LEGAL STANDARD

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added; citation omitted). Courts cannot weigh conflicting evidence, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)); and "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed," *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (alteration added; quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

### III.   DISCUSSION

At the outset, the Court identifies the undisputed facts underlying the parties' cross-motions for summary judgment.

The parties agree Plaintiffs owe FIGG a duty to defend claims of bodily injury and property damage under the policies. (*See* Pls.' SOF ¶¶ 2, 4; Def.'s Opp. to Pls.' SOF ¶¶ 2, 4). The parties also agree the policies include professional liability exclusions, which, if triggered, exempt Plaintiffs from the duty to defend. (*See id.* ¶¶ 3, 5). The parties do not dispute that the allegations in the Underlying Complaints pertained to "bodily injury" or "property damage" under Plaintiffs'

policies.  (*See generally* Pls.' Mot.; Def.'s Mot.).  The parties thus do not dispute that Plaintiffs owed FIGG a duty to defend, barring application of the Exclusion in Plaintiffs' policies.

These agreements lead to the primary issue on which the parties depart: whether the Exclusion applies.  If the Exclusion applies, Plaintiffs did not owe FIGG a duty to defend and may seek reimbursement for payments made and costs incurred on FIGG's behalf defending the allegations in the Underlying Complaints.  If the Exclusion does not apply, Plaintiffs owed FIGG a duty to defend the Underlying Complaints and are therefore not entitled to reimbursement of defense-related payments.

### A.  The Parties' Briefing

It is helpful to summarize the parties' positions, as elucidated in their briefing, and in the order in which the arguments are presented.  Plaintiffs' argument is straightforward.  Plaintiffs assert they did not owe FIGG a duty to defend because every allegation in the Underlying Complaints falls under the Exclusion.  (*See generally* Pls.' Mot.).  Plaintiffs focus on the meaning of "arising out of" and "professional services" under Florida law.  (*See id.* 7–13).  Plaintiffs ask the Court to consider, in addition to the Underlying Complaints, a professional services agreement (the "Agreement") between FIGG and MCM to properly conceptualize the work FIGG performed on the bridge project.  (*See id.* 15–16).

Plaintiffs go on to argue that even if the allegations do not describe "'professional services,' [they] at least 'arise out of' the professional services that FIGG rendered or failed to render."  (*Id.* 16 (alteration added)).  In support of this point, Plaintiffs rely on a recent case from the Eleventh Circuit, *Witkin Design Group, Inc. v. Travelers Property Casualty Company of America*, 712 F. App'x 894 (11th Cir. 2017) (concluding the insurer owed no duty to defend based on an identical professional liability exclusion).  (*See* Pls.' Mot. 14).

Because they had no duty to defend FIGG, Plaintiffs also insist they are entitled to reimbursement for all defense-related payments made on FIGG's behalf. (*See* Pls.' Mot. 17–18). To date, Plaintiffs have contributed $840,893.61 in defense-related payments and argue the reservation-of-rights letters sent to FIGG entitle them to full reimbursement. (*See id*. 18). Alternatively, Plaintiffs seek at least $270,343.52 — the amount they spent specifically defending FIGG against the Underlying Complaints. (*See id*.).

In its Response and Cross-Motion, FIGG disagrees, stating "[f]or an insurer to avoid its duty to defend based on an exclusion, the insurer must establish that the underlying pleading's allegations fall solely and entirely within the relied upon exclusion." (Def.'s Mot. 3–4 (alteration added; citation and emphasis omitted)). According to FIGG, Plaintiffs cannot meet this burden. (*See generally id*.).

To start with, FIGG contends the Court should not look beyond the allegations in the Underlying Complaints. (*See id.* 4–7). FIGG insists Plaintiffs fail to cite to an applicable exception to the "eight corners rule" which would allow the Court to consider the Agreement between FIGG and MCM. (*See id.*).

FIGG next turns to the merits of the Exclusion. In FIGG's words: "[d]espite the breadth of 'arising out of' and the definition of 'professional services' in the professional services exclusions, there are allegations [in] the [Underlying Complaints] which do not fall solely and entirely within the definition of 'professional services' and thus are outside the [Exclusion] requiring [Plaintiffs] to defend [FIGG]." (*Id.* 9 (alterations added)). FIGG directs the Court's attention to non-Florida case law concluding professional liability exclusions do not apply to allegations similar to those in the Underlying Complaints. (*See id.* 9–13). FIGG relies on *S.T. Hudson Engineers, Incorporated v. Pennsylvania National Mutual Casualty Company*, 909 A.2d

1156 (N.J. Super. Ct. App. Div. 2006), as "extremely instructive." (*Id*. 9–12). FIGG notes the court in *S.T. Hudson Engineers* "determined that the professional liability exclusion did not apply to alleged liability for failure to warn of a pier collapse or negligent misrepresentation about the condition of the pier." (*Id.* 10 (citation omitted)).

FIGG then turns to the reimbursement issue, which it argues is premature. (*See id*. 16). If the Court is inclined to resolve the issue, FIGG contends Plaintiffs do not have a right to reimbursement under Florida law based on the reservation-of-rights letters. (*See id*. 16–20). Finally, in the event the Court finds a right to reimbursement, FIGG asks the Court to limit reimbursement to $270,343.52, the amount Plaintiffs incurred defending FIGG against the Underlying Complaints. (*See id.* 20).

In their Reply, as to the duty to defend, Plaintiffs state "FIGG has elected to largely ignore the binding case law cited in [Plaintiffs'] Motion." (Pls.' Reply 8 (alteration added)). Plaintiffs argue "none of the cases cited by FIGG involves a professional services exclusion like the [Exclusion] at issue here." (*Id*. 9 (alteration added)). Plaintiffs review and distinguish the cases on which FIGG relies, concluding all of them "involve professional services exclusions that are either narrower or less clear" than the Exclusion here. (*Id*. 10–11). Plaintiffs state a close analysis of the Underlying Complaints "reveals no allegations that could potentially be deemed as unrelated to professional services," as defined by the Exclusion. (*Id*. 15 (internal quotation marks and citation omitted)).

In the last submission on these cross-motions, Defendant's Reply, FIGG insists "there can be no such thing as 'binding precedent' relative to an allegation-specific analysis." (Def.'s Reply 5). Instead, FIGG invites the Court to look to the "specific allegations against the insured" and conclude "not all of the allegations against FIGG would fall into enumerated services set forth in

the definition of 'professional services' in the [Exclusion] . . . ."  (*Id.* 7 (alterations added)).  FIGG

proceeds to identify the allegations it maintains fall outside the Exclusion.  (*See id.* 7–10).  And

on the issue of reimbursement, FIGG argues "Plaintiffs' position that FIGG's September 24, 2018

letter did not 'unequivocally reject' Travelers' attempt to reserve its right to reimbursement of any

defense fees and costs paid on FIGG's behalf . . . created a genuine issue of material fact relative

to their entitlement to reimbursement, and accordingly, summary judgment on this issue is not

appropriate."  (*Id.* 10 (alteration added; citations omitted)).

**B.  Analysis**

*1.     Duty to Defend*

The Court first addresses whether it can consider the Agreement between FIGG and MCM

as part of its duty-to-defend analysis.  The Court next sets forth the applicable legal framework

which guides its consideration in determining whether Plaintiffs owed FIGG a duty to defend.

Finally, the Court considers the allegations against FIGG in the Underlying Complaints, followed

by additional arguments raised in the parties' briefing.

a.     The Professional Services Agreement between FIGG and MCM

"The construction of insurance contracts is governed by substantive state law," which the

parties agree is Florida law.  *Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir.

1985) (citation omitted).  Under Florida law, "[t]he duty to defend must be determined from the

allegations in the complaint."  *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 443 (Fla. 2005)

(alteration added; citations omitted).  In other words, the duty to defend "is determined solely by

the allegations against the insured, not by the actual facts, nor the insured's version of the facts."

*Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So. 2d 579, 579–80 (Fla. 3d DCA 1993) (citation

omitted).  Therefore, "[w]hen the actual facts are inconsistent with the allegations in the complaint,

the allegations in the complaint control in determining the insurer's duty to defend." *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 814 (Fla. 1st DCA 1985) (alteration added; citations omitted).

Florida courts have recognized some "natural exceptions" to the rule that the duty to defend is determined solely by the allegations in the claimant's complaint. *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 10 n.2 (Fla. 2004). These exceptions apply in "exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 786 (11th Cir. 2008) (citation and footnote call number omitted).

As stated, Plaintiffs ask the Court to look beyond the Underlying Complaints and consider the Agreement between FIGG and MCM to "obtain an understanding" of the labor and services allegedly provided by FIGG. (Pls.' Mot. 16). Plaintiffs state because the Underlying Complaints "expressly allege that FIGG was 'retained to provide labor and services' and the Agreement, which sets forth the scope of the 'labor and services,' is undisputed, the Court may properly consider the Agreement in assessing [Plaintiffs'] duty to defend, notwithstanding its omission from the [Underlying Complaints]." (Pls.' Reply 5 (alterations added)).

FIGG disagrees, stating the "lack of clarity surrounding the terms 'labor and services' does not permit the insurer to seek clarity outside of the pleadings . . . ." (Def.'s Reply 3 (alteration added)). FIGG does not dispute the existence of the Agreement, but challenges Plaintiffs' attempt to rely on it to "demonstrate that FIGG only performed professional services despite allegations to the contrary." (*Id.*). FIGG argues there is a "distinction between what FIGG is alleged to have done versus what FIGG contracted to do." (*Id.*). FIGG has the better argument on this preliminary point.

Under Florida law, when there is an inconsistency between the facts and the complaint's allegations, the allegations control in determining the insurers' duty to defend. *See Baron Oil Co.*, 470 So. 2d at 814 (citations omitted). And when "extrinsic evidence [is] not uncontroverted or manifestly obvious to all so as to preclude coverage[,]" it should not be considered in determining whether there is a duty to defend. *Advanced Sys., Inc. v. Gotham Ins. Co.*, No. 3D18-1744, 2019 WL 1646106, at *3 (Fla. 3d DCA Apr. 17, 2019) (alterations added).

Plaintiffs are not asking the Court to acknowledge the existence of the Agreement — the existence of which is irrelevant in determining Plaintiffs' duty to defend. Instead, Plaintiffs ask the Court to use the Agreement to define the scope of FIGG's actions in addition to, and in place of, the allegations in the Underlying Complaints. (*See* Pls.' Mot. 16). This, the Court will not do. Even if the Agreement provides clarity as to the facts, only the allegations in the Underlying Complaints are relevant to the Court's resolution of the duty to defend. *See Baron Oil Co.*, 470 So. 2d at 814. The Court thus considers only the Underlying Complaints and the language of the Exclusion.

### b.  The Legal Framework Governing the Duty to Defend

"Under Florida law, insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). "Ambiguities are construed against the insurer and in favor of coverage." *Id.* "Although ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous." *Id.* "Because they tend to limit or avoid liability, exclusionary clauses are construed more strictly than coverage clauses." *Category 5 Mgmt. Grp., LLC v. Companion Prop. & Cas. Ins. Co.*, 76 So. 3d 20, 23 (Fla. 1st DCA 2011) (citation omitted). But where "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy

provision or an exclusory provision." *Taurus Holdings, Inc.*, 913 So. 2d at 532 (internal quotation marks and citation omitted).

"The term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Id*. at 539 (internal quotation marks and citation omitted). The term "requires more than a mere coincidence between the conduct . . . and the injury. It requires some causal connection, or relationship." *Id.* (alteration added; internal quotation marks and citation omitted). It does not require proximate cause. *See id*. at 540 (citation omitted).

Even in the exclusory context, "arising out of" retains its broad interpretation. *See Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 293 (Fla. 2007). The Florida Supreme Court has held the phrase "arising out of" is broader than the phrase "because of" and contemplates a more attenuated link. *See id.* Federal courts have consistently applied this broad construction to "arising out of" provisions. *See Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1350 (11th Cir. 2017) ("Decisions of the Florida Supreme Court, the Florida Courts of Appeal, and this Court show that the 'arising out of' standard is not difficult to meet."); *see also James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008).

When "professional services" are undefined, Florida courts consider many factors, including "whether the service involves specialized skill, requires specialized training, is regulated, requires a degree, and/or whether there is an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services." *Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*., 143 F. Supp. 3d 1283, 1297 (S.D. Fla. 2015) (quotation marks and citation omitted). Whether "an act results from the nature of a professional service is determined by focusing upon the particular act itself, as opposed to the character of the individual

engaging in the act." *Estate of Tinervin v. Nationwide Mut. Ins. Co*., 23 So. 3d 1232, 1237 (Fla. 4th DCA 2009) (internal quotation marks and citation omitted). Accordingly, professional services are those which require specialized skill, training, or experience. *See Auto-Owners Ins. Co. v. E.N.D. Servs., Inc*., 506 F. App'x 920, 925 (11th Cir. 2013).

Plaintiffs contend the allegations against FIGG "'arise out of' FIGG's work as an engineer and its exercise of professional judgment on the FIU Bridge project." (Pls.' Mot. 5). In support, Plaintiffs emphasize the Eleventh Circuit's analysis in *Witkin Design Group, Inc*., 712 F. App'x at 894. (*See id*. 14).

FIGG, for its part, insists certain allegations in the Underlying Complaints fall outside the Exclusion. (*See* Def.'s Mot. 9). FIGG relies primarily on reasoning by non-Florida courts applying different frameworks to distinguishable exclusions. (*See generally id.*). Most notably, FIGG relies on *S.T. Hudson Engineers, Inc.*, 909 A.2d at 1156, as "extremely instructive in that the allegations in that action against the insured/engineer were almost identical to those against FIGG and the factual circumstances giving rise to the action are likewise similar." (Def.'s Mot. 9).

In *S.T. Hudson Engineers*, the court implicitly rejected Florida courts' interpretation of contracts, "disagree[ing]" with the insurer's assertion "the professional services exclusion limiting coverage to personal injury or property damage 'arising out of the rendering of or failure to render any professional services by you or . . . on your behalf' should  be construed broadly . . . ." 909 A.2d at 1163 (alterations added). The *S.T. Hudson Engineers* court stated the "more inclusive use of the phrase 'arise out of,' urged by [the insurer], has been to provide coverage, not limit it." *Id.* (alteration added; citations omitted). Applying a narrower legal framework, the court considered a less inclusive professional service exclusion, concluding the insurer owed a duty to defend. *See*

*id.* at 1164–66.  The undersigned is not persuaded by *S.T. Hudson Engineers*, which applies a conflicting framework to a materially different professional services exclusion.

In any event, FIGG states the Court will need to make a determination of Plaintiffs' obligation to defend FIGG based solely on the allegations against FIGG in the Underlying Complaints; and the case law throughout the country, including *Witkin*, is of little assistance.  (*See* Def.'s Reply 2).  FIGG contends it "does not dispute the breadth of 'arising out of' in Florida or ignore the *Witkin* decision," but instead argues "there simply is no 'binding precedent' requiring this Court to reach a certain conclusion or the same conclusion as the *Witkin* court."  (*Id.* 1).

While the Court agrees with FIGG the *Witkin* panel's *conclusion* is not necessarily compelled here (*see id.* 1–2), the court's reasoning is certainly instructive in defining the scope of the Exclusion.  *See Witkin Design Group, Inc.*, 712 F. App'x at 894.

In *Witkin*, a child was struck and killed by a vehicle at an intersection.  *See id.* at 895.  A wrongful death action was brought against Witkin Design Group ("Witkin"), the "landscape architect" responsible for "design[ing] and construct[ing] the intersection where the accident occurred . . . ."  *Id.* (alterations added; citation omitted).  Witkin allegedly "engineered, surveyed, planned, developed, constructed, designed and maintained" the intersection where the accident occurred.  *Witkin Design Grp, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 16-cv-20484-FAM, Second Amended Complaint for Wrongful Death [ECF No. 1-2] ¶ 30, filed February 9, 2016 (S.D. Fla.).  Witkin allegedly committed multiple negligent acts, including "failing to warn or adequately warn pedestrians of the intersection's traffic flow causing pedestrians to be unaware of the intersection's dangerous propensity to force motorists into the wrong lanes of travel."  (*Id.* ¶ 378(G)).

Witkin later sought a declaratory judgment against its insurer on its duty to defend the

wrongful death action.  *See Witkin Design Grp., Inc.*, 712 F. App'x at 895.  The magistrate judge concluded the insurer did not owe Witkin a duty to defend because the allegations in the underlying complaint fell under a professional services exclusion identical to the one in this case.  *See id*. at 895–96.  The district court agreed, adopting the magistrate judge's recommendation, and the Eleventh Circuit affirmed.  *See id.* at 896.

The parties' arguments in *Witkin* mirror those here.  In *Witkin*, Travelers argued it did not owe a duty to defend on the basis the professional services exclusion precluded coverage.  *See Witkin Design Grp., Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 16-20484-CIV, 2016 WL 7670051, at *9 (S.D. Fla. Dec. 15, 2016).  Like FIGG, Witkin argued "at least some of the claims asserted against it in the underlying Wrongful Death Action fall outside the professional services exclusion. . . ."  *Id*. (alteration added; footnote call number omitted).  Specifically, Witkin argued the "Underlying Complaint, on its face, alleges negligence by Witkin that does not qualify as 'professional services,'" and "certain construction activities relating to the physical act of construction do not qualify as professional services."  *Id*. at *9–10 (internal quotation marks and citations omitted).

The court concluded all "claims asserted against Witkin in the underlying Wrongful Death Action fall under the Professional Services exclusions in both policies."  *Id*. at *10.  The court explained that just because an act or service "does not appear by itself in the non-exhaustive list of activities which constitute professional services does not mean that the act [itself] is not a professional service."  *Id*. (alteration added).  Further, the "construction of an intersection is not an endeavor that would be undertaken by a lay person.  Because the construction of an intersection is an activity that requires specialized skill or training, it constitutes a professional service under the policy . . . ."  *Id.* (alteration added).

The Eleventh Circuit affirmed, concluding "[t]he conduct of Witkin in designing and constructing the intersection falls squarely within the professional services exclusions." *Witkin Design Grp., Inc.*, 712 F. App'x at 897 (alteration added). Witkin was hired "to design and construct the intersection . . . . Such architecture and construction services require 'specialized skill or training,' and thus qualify as professional services." *Id.* (alteration added; footnote call number omitted).

Courts must construe a clear and unambiguous insurance policy provision by its plain meaning. *See Taurus Holdings, Inc.*, 913 So. 2d at 532 (citation omitted). Considering an exclusion identical to the one in Plaintiffs' policies, the Eleventh Circuit noted, "[t]here is no 'genuine inconsistency, uncertainty, or ambiguity' as to what counts as a professional service." *Witkin Design Grp., Inc.*, 712 F. App'x at 897 (alteration added; citation omitted). This remains true here; and any allegations in the Underlying Complaints "arising out of," "flowing from," or "having a connection with" a professional service, fall within the Exclusion. *Taurus Holdings, Inc.*, 913 So. 2d at 539.

Just as the insured in *Witkin* was alleged to have "design[ed] and construct[ed] the intersection," *Witkin Design Grp., Inc.*, 712 F. App'x at 897 (alterations added), the Underlying Complaints allege FIGG is liable "[b]y virtue of its professional engineer's status and by accepting the duties, obligations and responsibilities attendant to the *design and construction* of the FIU Pedestrian Bridge . . . ." (MWC ¶ 148; MCC ¶ 119 (alterations and emphasis added)). As the design and construction of an intersection requires specialized skill or training, *see Witkin Design Grp., Inc.*, 712 F. App'x at 897, so too, the design and construction of a pedestrian bridge requires specialized skill or training.

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

c.     Claims Brought Against FIGG in the Underlying Complaints

The Court assumes the reader's familiarity with the allegations against FIGG in the Underlying Complaints.  (*See generally* MWC; MCC).  For brevity, and in light of the sheer number of "relevant allegations" (Def.'s SOF 2–10), the Court does not address every allegation in detail.  While the Court addresses only some of the allegations, the forthcoming analysis applies to *all* factual allegations against FIGG.[5]

i) Count VII: Gross Negligence against FIGG (MWC)

Count VII of the MWC alleges FIGG failed to warn its workers and employees of the danger of working on the bridge.  (*See* MWC ¶¶ 133–134).  Specifically, the plaintiffs in the Underlying Action allege FIGG "*fail[ed] to communicate proper cautions* to the construction force/workers that cracks observed *on the bridge were a safety concern*."  (*Id.* ¶ 134 (f) (alteration and emphasis added)).  As Plaintiffs state throughout their Motion, these allegations plainly fall within the Exclusion, which defines both "failure to warn" and "job site safety" as professional services.  (*See* Exclusion ¶ 3(a)–(b)).

ii) Count VIII: Professional Gross Negligence against FIGG (MWC) and
Count VII: Professional Negligence Against FIGG (MCC)

These counts in the Underlying Complaints require little to no rigorous analysis. (*See generally* MWC ¶¶ 140–154; MCC ¶¶ 111–121).  These counts allege FIGG was "responsible for the *design and engineering* of the Bridge Project" (MWC ¶ 141 (emphasis added); MCC ¶ 112 (emphasis added)); FIGG is comprised of "professional engineers" required "to exercise [] independent professional judgment" (MWC ¶¶ 142–143 (alteration added); MCC ¶¶ 113–114 (alteration added)); FIGG "[f]ailed to comply with applicable OSHA regulations and other

---

[5] The Court addresses each count against FIGG individually.  To avoid redundancy, the Underlying Complaints are grouped together in the circumstances where their allegations are identical.

industry standards, including but not limited to ANSI/ASSE standards" (MWC ¶ 147 (f) (alteration added); MCC ¶ 118 (f) (alteration added)); and FIGG "[f]ailed to properly *supervise and inspect* the Bridge Project" (MWC ¶ 147 (g) (alteration and emphasis added); MCC ¶ 118 (g) (alteration and emphasis added)). These allegations fall under the Exclusion, which expressly includes any "architectural" or "engineering" services as professional services. (*See* Exclusion ¶ 3(b)). These allegations also have a connection with "design," "job site safety," "supervision," "inspection," "construction management," and "failure to warn" — all defined professional services under the Exclusion. (*Id.* ¶ 3(a)–(b)).

> iii) Count IX: Strict Liability Against FIGG (MWC) and Count IX: Strict Liability Against FIGG (MCC)

These counts in the Underlying Complaints allege "[a]s a result of the practices exercised by FIGG with respect to the *management, control, and supervision* of the FIU pedestrian bridge project, FIGG is strictly liable . . . ." (MWC ¶ 161 (alteration and emphasis added); MCC ¶ 133 (alteration and emphasis added)). They also state FIGG's participation in the bridge project reflects "abnormally dangerous construction activity" (MWC ¶ 156; MCC ¶ 128), resulting from the "innovative" nature of the bridge and "unusual choice of materials" (MWC ¶ 157; MCC ¶ 129). FIGG's actions, as described by these allegations, required specialized skill or training and fall within the Exclusion. These actions arise out of FIGG's "supervision," "design," "specification," "engineering activity or service," and responsibility for "job site safety," among other defined professional services. (Exclusion ¶ 3(a)–(b)).

> iv) Count X: Negligent Failure to Ensure Safety Against FIGG (MWC)

This count of the MWC alleges "FIGG had a duty to notify and/or advise those working on the bridge of the danger of collapse." (MWC ¶ 164). Plaintiffs state FIGG breached its duties by "fail[ing] to disclose information" regarding "the cracks and that the condition of those cracks

was worsening." (*Id*. ¶ 167 (alteration added)). Count X expressly premises liability on FIGG's *failure to warn* workers of *job site safety* — two clearly defined professional services. (*See* Exclusion ¶ 3(a)–(b)). Further, any dangers FIGG was aware of regarding the structural safety of the bridge would necessarily arise out of its "engineering services" requiring "specialized skill or training." (*Id*.).

> **v) Count XI: Negligent Misrepresentation (Gross Negligence) Against FIGG (MWC)**

This count of the MWC alleges "FIGG represented to those employed to work, and who were in fact working, on the construction site of the bridge project that the project construction was safe." (MWC ¶ 170). The alleged misrepresentation is based on FIGG's knowledge the "bridge span structure was unstable, unsound, defective, [and] dangerous. . . ." (*Id*. ¶ 177 (alterations added)). These allegations certainly arise out of "job site safety" and "inspection services" — defined professional services under the Exclusion. (Exclusion ¶ 3(b)). More so, the "provision of or failure to provide" any "opinion or recommendation" is also defined as a professional service. (*Id*. ¶ 3(a)). As previously stated, any knowledge or opinions FIGG held about the structural stability or dangers of the bridge arise out of its "engineering services" and require "specialized skill or training." (*Id*. ¶ 3(a)–(b)).

> **vi) Count VIII: Negligence Against FIGG (Not Professional)[6](MCC)**

This count of the MCC alleges FIGG "owed a duty to use reasonable care in performing its work on the bridge . . . ." (MCC ¶ 124 (alteration added)). FIGG allegedly breached this duty when it, among other things, "negligently failed to ensure the safety of the public during the

---

[6] As the parties acknowledge (*see* Pls.' Mot. 12; Def.'s Reply 8), the theories and labels in a complaint are not dispositive. *See Trailer Bridge, Inc. v. Illinois Nat'l Ins. Co*., 657 F.3d 1135, 1145 (11th Cir. 2011) ("[T]he theories advanced and labels used in a complaint are subordinate to the facts alleged for the purpose of determining the duty to defend." (internal quotation marks and citations omitted; alteration in original)).

*installation* of the bridge" (*id*. ¶ 125 (a) (emphasis added)); "failed to assess, consider, and account for *project site safety risks* and develop appropriate *risk mitigation strategies, safety planning and safety measures* . . ." (*id*. ¶ 125 (d) (emphasis and alteration added)); and "failed to implement adequate safety measures prior to *post-tensioning operations*, including completely closing the Tamiami Trail roadway under the main bridge span on March 15, 2018" (*id*. ¶ 125 (e) (emphasis added)). In addition to alleging FIGG failed to ensure "job site safety;" the installation of a bridge, as well as actions regarding post-tensioning operations, at a minimum, have a connection with "engineering services" requiring "specialized skill or training," thus triggering the Exclusion. (Exclusion ¶ 3(b)).

### vii) Count X: Gross Negligence Against FIGG (MCC)

This count of the MCC alleges FIGG "deviated from the industry standard of care" while performing work that was "inherently dangerous and ultrahazardous in nature . . . ." (MCC ¶¶ 136–137 (alteration added)). Count X also states FIGG "deviated and departed from the prevailing professional standards of care and failed to comply with its duties in the *construction and engineering* of the bridge." (*Id*. ¶ 138 (emphasis added)). Again, the allegations against FIGG arise out of professional services falling entirely under the Exclusion. (*See* Exclusion ¶¶ 3(a)–(b)).

### viii) Count XI: Negligent Failure to Disclose Against FIGG (MCC)

This count of the MCC alleges FIGG breached its duty of care in one or more of the following ways: "failed to disclose . . . that the bridge was unsafe" (MCC ¶ 142 (a) (alteration added)); "failed to disclose . . . that the materials incorporated into the project were defective, deficient and/or did not meet specifications or industry standards" (*id*. ¶ 142 (b) (alteration added)); failed to disclose the bridge was structurally unsafe (*see id*. ¶ 142 (c)); "failed to disclose . . . the impending bridge collapse" (*id*. ¶ 142 (f) (alteration added)); and "assured the construction force,

and by implication the public at large and the Plaintiff, that the cracks observed on the bridge structure before its collapse were not a safety concern for the completion of the project" (*id.* ¶ 142 (e)).   These allegations against FIGG arise out of professional services and thus fall under the Exclusion.   Failing to disclose an impending bridge collapse and other safety concerns fall within the scope of a "failure to warn."   (Exclusion ¶¶ 3(a)–(b)).   Opinions regarding the structural integrity of the bridge, adequacy of materials incorporated into the bridge, and observations made based on the cracking of the bridge clearly arise out of "engineering services" and require "specialized skills and training."   (*Id.*).

### ix) Count XII: Negligent Misrepresentation Against FIGG (MCC)

This count of the MCC alleges FIGG "made both verbal and nonverbal representations that the bridge project was safe and posed no dangers to the members of the public at large."   (MCC ¶ 146).   Further, Count XII count states "by allowing the travel lanes below the bridge to remain open and/or by not insisting or *recommending* that they be closed during post tensioning work on March 15, 2018, the Defendant represented to the public at large and the Plaintiff in particular that the bridge was safe . . . ."   (*Id.* ¶ 147 (emphasis and alteration added)).   Again, these allegations fall under the Exclusion, which encompasses the "provision of or failure to approve or provide any opinion, recommendation, or warning."   (Exclusion ¶¶ 3(a)–(b)).   And any representations made regarding the safety of the bridge project would also arise out of "engineering services," "quality control," and "job site safety."   (*Id.*).

### d.   Additional Arguments Raised in the Parties' Briefing

FIGG repeatedly asserts the allegations in the Underlying Complaints do not fall solely within the Exclusion.   (*See* Def.'s Mot. 9–16; Def.'s Reply 7–10).   FIGG conclusorily states the Exclusion "does not exclude actions or claims related to negligent misrepresentation, failure to

ensure the safety of the public at large, actual construction, manufacturing, manual/physical labor necessary to carrying out certain tasks, alleged failures to disclose, failures to notify, or failure to control." (Def.'s Reply 8).

FIGG seems to suggest that if a specific term is not expressly listed as a professional service, it does not fall under the Exclusion. Not so. The Exclusion, *by its own terms*, provides a non-exhaustive list of predetermined professional services. (*See* Exclusion ¶ 3; *see also Witkin Design Grp., Inc.*, 2016 WL 7670051, at *10 ("The fact that the word 'construction' does not appear by itself in the non-exhaustive list of activities which constitute professional services does not mean that the act of construction is not a professional service.")). Indeed, the Court has addressed many of the allegations FIGG describes and found each factual allegation falls under the Exclusion.

FIGG then references specific allegations in the Underlying Complaints that purportedly "do not fall within the definition of 'professional services', necessitating Plaintiffs' defense obligation to FIGG." (Def.'s Reply 8). FIGG lists, among others:

- failure to require that all construction operations cease due to safety issues that posed an unreasonable risk of harm;
- failure to conduct post-tensioning operations during off-peak hours on March 15, 2018;
- the negligent and careless failure to monitor, supervise and otherwise prevent the development of forces that could challenge the integrity of the bridge superstructure during the movement and erection phase.

(*See id*. 8–9 (citing MWC ¶ 147; MCC ¶ 118)).

FIGG's assertions fail to persuade. By its plain meaning, the Exclusion encompasses these activities as professional services. (*See* Exclusion ¶¶ 3(a)–(c)). Failing to require "construction operations to cease" arises out of the professional service of "construction management." (*Id*.). Additionally, decisions on "post-tensioning operations" and acts or omissions challenging the

"integrity" of the bridge "during the movement and erection phase" necessarily arise out of "engineering services" under the Exclusion. (*Id.*).

Undeterred, FIGG states "[o]ther counts against FIGG allege that FIGG failed to control certain aspects of the project as well as disclose information, and neither term or activity is excluded by the definition of 'professional services.'" (Def.'s Reply 9 (citing MWC ¶¶ 161, 174) (alteration added)). FIGG's reliance on the absence of a specific term from "professional services" is again misplaced. As to the specific allegations to which FIGG cites, the MWC discusses "the practices exercised by FIGG with respect to the *management, control, and supervision* of the FIU pedestrian bridge project" (MWC ¶ 161 (emphasis added)); and how "FIGG failed to disclose known information about the condition of the bridge to those working on the construction site of the bridge project" (*id.* ¶ 174).

Contrary to FIGG's assertions, these allegations from the MWC fall under the Exclusion. The "management, control, and supervision" of the bridge project arise out of FIGG's "supervision," "quality control," "engineering services," or "construction management." (Exclusion ¶¶ 3(a)–(b)). Further, actions or inactions relating to the safety of the bridge site arise out of "job site safety" or "engineering services," and the failure to disclose information certainly arises out of the "failure to provide an opinion, recommendation, or warning." (*Id.*).

FIGG states its "breaches were to the public at large," and "[n]otably, ensuring the safety of the 'public' is not the same as 'job site safety.'" (Def.'s Reply 9 (alteration added; citation omitted)). Although there are differences between "the public" and "job site safety," FIGG makes no attempt to explain how injuries to specific members of the public, resulting from the literal collapse of the job site, are unrelated to "job site safety." In any event, the Court does not rely solely on "job site safety" in concluding that every pertinent allegation in the Underlying

Complaints arises out of FIGG's rendering of or failure to render professional services.

FIGG also argues the facts described in the Underlying Complaints establish a duty to defend. (*See id.* 8). FIGG states the Underlying Complaints allege FIGG "provided labor and services" on the project, and these do not fall under the Exclusion. (*Id.* (citing MWC ¶ 8; MCC ¶ 7) (internal quotation marks omitted)). Additionally, FIGG asserts some general allegations refer to all Defendants collectively "when referencing the work performed, which includes construction, physical closure of the road and manufacturing, all of which are unexcluded tasks." (*Id.* (citations omitted)).

The Court has previously addressed FIGG's construction work and safety decisions. As to FIGG's argument the inclusion of "labor and services" necessitates Plaintiffs' duty to defend, the undersigned disagrees. The factual allegations FIGG cites state only that FIGG was "retained to provide labor and services on the project." (MWC ¶ 8; MCC ¶ 7). FIGG fails to explain what liability is created by this background information or how this allegation changes the specific claims stated against FIGG. (*See generally* Def.'s Reply).

In any event, the Underlying Complaints each clearly state "Defendant, FIGG, a designer of pedestrian bridges, was responsible for the design and engineering of the Bridge Project and employed the engineer of record for this Bridge Project." (MWC ¶ 141; MCC ¶ 112). To the extent the labor and services provided by the bridge engineer are not "engineering services" under the Exclusion, the labor and services performed must have a connection with or arise out of the "design and engineering of the Bridge Project" which FIGG was hired to perform. (*Id.*).

Considering all the Underlying Complaints' allegations against FIGG, the undersigned concludes each "aris[es] out of the rendering or failure to render any 'professional services.'" (Exclusion ¶ 1 (alteration added)).

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

2.     *Reimbursement of Defense Fees*

Plaintiffs argue the reservation-of-rights letters sent throughout the underlying litigation created a right to seek reimbursement for defense-related payments made defending FIGG against the Underlying Complaints.  (*See* Pls.' Mot 17–18).  The letters each allegedly include a full reservation of rights, which in Plaintiffs' view entitle them to seek reimbursement under Florida law.  (*See id*.).

FIGG makes numerous arguments in response.  (*See* Def.'s Mot. 16–20).  First, FIGG argues the issue is premature because Plaintiffs failed to obtain a declaration stating they had no duty to defend.  (*See id*. 16 (citing *James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F. Supp. 3d 1246 (N.D. Fla. 2016)).  The Court disagrees.

Certainly, Plaintiffs cannot seek reimbursement for fees without the Court first concluding the absence of a duty to defend.  But, FIGG cites no authority stating Plaintiffs cannot seek reimbursement within the same motion that seeks declaratory relief on the duty-to-defend question.  Curiously, *James River* — the very case on which FIGG relies — seems to undercut FIGG's position.  188 F. Supp. 3d at 1260–62.

In *James River*, the insurer sought "a declaration" that it had "no duty to defend or indemnify [the insured]," and also requested "reimbursement of attorneys' fees and costs incurred to defend [the insured] in the underlying action."  *Id*. at 1252 (alterations added; citations to the record omitted).  After concluding the insurer did not owe a duty to defend, the court addressed whether the insurer was entitled to reimbursement of the costs expended defending the insured.  *See id*. at 1261.  Because the insurer did not owe a duty to defend, the court concluded the issue of reimbursement was not premature.  *See id.*  As the undersigned finds Plaintiffs did not owe FIGG a duty to defend, the question of reimbursement is not premature.

Second, FIGG asks the Court to ignore Florida law and conclude an insurer cannot unilaterally alter an insurance policy to seek reimbursement through a reservation-of-rights letter by "opt[ing] to follow the holdings and reasoning espoused by a majority of other courts that have decided this issue . . . ." (Def.'s Mot. 17 (alterations added; citations omitted)). The Court declines FIGG's invitation.

Where there is no Florida Supreme Court precedent to follow on an issue of Florida law, federal courts "are bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014) (internal quotation marks and citation omitted). FIGG recognizes that the "present case law available in Florida finds that it is possible for an insurer's reservation of rights to create a right to recoup defense costs that would not otherwise exist." (Def.'s Mot. 18 (citation omitted)). Because FIGG fails to point to any persuasive authority suggesting the Florida Supreme Court would decide the issue differently, the undersigned will not ignore Florida's intermediate appellate courts. *See Winn-Dixie Stores, Inc.*, 746 F.3d at 1021.

FIGG next argues Plaintiffs' reservation-of-rights letters are inadequate under Florida law because they (1) fail to fairly inform the insured that the insurer is seeking to shift the risk to the insured if it is determined a defense was not owed, and (2) fail to inform the insured that it must object within a specified time period or its silence will be deemed an acceptance. (*See* Def.'s Mot. 18 (alteration added) (citing *Nationwide Mut. Fire Ins. Co. v. Royall*, 588 F. Supp. 2d 1306, 1317–1318 (M.D. Fla. 2008))). Plaintiffs disagree, contending they reserved the right to seek reimbursement through their reservation-of-rights letters, FIGG continued to accept the defense related payments, and "Florida law requires no more." (Pls.' Reply 17).

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

The Court must again agree with Plaintiffs. FIGG's argument the reservation-of-rights letters fail to "fairly inform" of Plaintiffs' intention to seek reimbursement is wholly baseless. FIGG expressly acknowledges the "[i]nsurers attempt to reserve the right to seek reimbursement of any defense related payments . . ." in its September 24, 2018 letter. (*See* FIGG's September 24, 2018 Letter [ECF No. 152-1] 6 (alterations added).

*Royall* also fails to persuade. Relying on *Royall*, FIGG argues a reservation-of-rights letter must include language stating a failure to object constitutes an acceptance. (*See* Def.'s Mot. 19 (citing *Royall*, 588 F. Supp. 2d at 1318)). In *Royall*, the court acknowledged Florida appellate courts do not seem to require this language, noting they "simply appear to have implicitly assumed that the insured had accepted the insurer's offer." *Royall*, 588 F. Supp. 2d at 1318. The court then went on to say it anticipated the Florida Supreme Court would require express notice that a failure to object would constitute an acceptance. *See id*.

The undersigned joins *James River* in "respectfully disagree[ing] with the *Royall* court's reasoning." *James River Ins. Co.*, 188 F. Supp. 3d at 1261 (alteration added). Florida's intermediate appellate courts have issued opinions "directly on point and do not suggest that a reservation of rights is ineffective if it does not provide a date-certain by which the insured can reject the offer." *Id.* (referencing *Colony Ins. Co. v. G & E Tires & Serv., Inc.*, 777 So. 2d 1034, 1039 (Fla. 1st DCA 2000); *Jim Black & Assocs., Inc. v. Transcon. Ins. Co.*, 932 So. 2d 516, 518 (Fla. 2d DCA 2006)); *see also Certain Interested Underwriters at Lloyd's, London Subscribing to Certificate of Ins. No. 9214 v. Halikoytakis*, No. 8:09-CV-1081-T-17, 2011 WL 7305888, at *3 (M.D. Fla. Dec. 21, 2011) ("[T]he controlling decisions of Florida's intermediate courts of appeal are contrary to [*Royall*'s] principle. The reservation of rights letters in both *Jim Black* and *Colony* contained no language stating a time limit for accepting or rejecting the defense, and in both cases

reimbursement was awarded." (alterations added)). *Royall* does not point to any persuasive decision from the Florida Supreme Court that would suggest disagreement with *Jim Black* or *Colony Insurance*. As such, the Court does not ignore the decisions of Florida's intermediate courts of appeal. *See Winn-Dixie Stores, Inc*., 746 F.3d at 1021.

FIGG also argues its September 24, 2018 letter was a "timely rejection" to Plaintiffs' reservation of rights that "precludes Plaintiffs from recovering defense fees and costs because there was never an acceptance of the new proposed term." (Def.'s Mot. 19 (citations omitted)). FIGG contends Plaintiffs' position "that FIGG's September 24, 2018 letter did not 'unequivocally reject' Travelers' attempt to reserve its right to reimbursement" creates a genuine issue of material fact precluding summary judgment on the issue. (Def.'s Reply 10).

Plaintiffs disagree, explaining FIGG's letter is not a rejection of Plaintiffs' reservation of rights, and, in any event, FIGG's September 24, 2018 letter pre-dates Plaintiffs' October 22, 2018 reservation-of-rights letter. (*See* Pls. Reply 18). "After receipt of the October 22, 2018 letter, FIGG remained silent, did not object to the reservation, and continued to accept defense-related payments from Travelers." (*Id*. (emphasis omitted)). Plaintiffs state "[i]f FIGG's counsel had wanted to 'unequivocally reject' Travelers' reservation of its right to seek reimbursement, he certainly knew how to do it; he just didn't." (*Id*. (alteration added)).

Plaintiffs are once again correct. The Court does not need to determine whether FIGG's September 24, 2018 letter constituted a rejection of Plaintiffs' reservation of rights. The Motions request a determination of Plaintiffs' duty to defend FIGG against the MWC and the MCC. Plaintiffs' reservation-of-rights letter dated October 22, 2018 is the relevant letter acknowledging receipt of the Underlying Complaints at issue and agreeing to defend FIGG as to those allegations, subject to a reservation of rights. (*See* Ivanis Affidavit [ECF No. 146-1] ¶ 8; Plaintiffs' October

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

22, 2018 letter [ECF No. 146-1] 81–83).

FIGG's September 24, 2018 letter expressly acknowledges it is a response to prior correspondence, stating FIGG is not waiving "its rights to contest each and every reservation set forth in the *above referenced correspondences*." (FIGG's September 24, 2018 Letter 10 (emphasis added)). Whether FIGG rejected the prior reservation-of-rights letters is irrelevant to the Court's disposition. Plaintiffs sent a reservation-of-rights letter to FIGG on October 22, 2018, regarding the Underlying Complaints in this case; FIGG accepted Plaintiffs' defense; and FIGG failed to object to the reservation after receipt of the letter. Florida law requires nothing more from Plaintiffs to be reimbursed for defense-related payments determined to be outside the scope of Plaintiffs' duty to defend. *See Colony Ins. Co.*, 777 So. 2d at 1039; *Jim Black & Assocs., Inc.*, 932 So. 2d at 518.

The only remaining issue is the *amount* of reimbursement owed to Plaintiffs. The parties do not dispute Plaintiffs have made defense-related payments of $840,893.61 on behalf of FIGG — $270,343.52 of which have been paid since the filing of the Underlying Complaints. (*See* Pls.' SOF ¶ 18; Def's Opp. to Pls.' SOF ¶ 18). Plaintiffs argue they are entitled to reimbursement of the full amount of defense-related payments made on FIGG's behalf — including payments pre-dating the Underlying Complaints. (*See* Pls.' Mot. 18 n.1). Plaintiffs state "the same arguments that compel the conclusion that Travelers has no duty to defend the [Underlying Complaints] apply with equal — if not greater — force to the earlier iterations of those complaints." (*Id*. (alteration added)). FIGG disagrees, stating "it is truly remarkable that Plaintiffs would attempt to seek recovery of anything beyond the amounts expended towards FIGG's defense related to any pleadings other than the Third Amended Master Complaints." (Def.'s Mot 20).

In this, FIGG is correct. As the Court noted in its March 19, 2019 Order, Plaintiffs can

seek a "declaration of the lack of a duty to defend FIGG and their entitlement to reimbursement of fees and costs advanced to FIGG based on *the state court pleadings attached to the SAC*."  (*Id.* 3 (emphasis added)).  The Court will not award fees for defense-related payments made regarding state-court complaints the Court has not considered and which are not the subject of the SAC. Presumably, the parties can review the prior – and later – state court complaints, compare them to the Underlying Complaints, and guided by the Court's analysis here, determine whether a duty-to-defend argument can be sustained.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned concludes Plaintiffs did not owe FIGG a duty to defend FIGG against the Underlying Complaints.  Plaintiffs are entitled to reimbursement for defense-related payments made to FIGG in defense of the allegations in the Underlying Complaints.  Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.   Plaintiffs, The Travelers Indemnity Company and The Phoenix Insurance Company's Renewed Motion for Summary Judgment **[ECF No. 144]** is **GRANTED in part**.

2.   Defendant, FIGG Bridge Engineers, Inc.'s Cross-Motion for Summary Judgment **[ECF No. 149]** is **DENIED in part**.

3.   Plaintiffs owed no duty to defend FIGG against the Underlying Complaints that have been dismissed in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2018-008144-CA-03.  Plaintiffs are entitled to reimbursement of the **$270,343.52** made in defense-related payments regarding these complaints.

CASE NO. 18-22585-CIV-ALTONAGA/Goodman

4.      Final judgment will issue by separate order.

5.      The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, this 24th day of June, 2019.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record